JEROME S. LIEB, Trading Together with ABRAHAM I. HARKAVY and Others as HARKAVY & LIEB, Transferee, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lieb v. Commissioner
Docket Nos. 2073-71; 2074-71; 2075-71; 2076-71; 2088-71; 8493-71
United States Tax Court
T.C. Memo 1974-272; 1974 Tax Ct. Memo LEXIS 45; 33 T.C.M. (CCH) 1231; T.C.M. (RIA) 740272; October 21, 1974, Filed. Jerome M. Miller, for the petitioners in Docket Nos. 2073-71, 2074-71, 2075-71, 2076-71 and 2088-71; and James W. Bowers for the petitioners in Docket No. 8493-71. William M. Gross, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined corporate income tax deficiencies and transferee liabilities in these cases as follows: Income Tax Deficiencies Petitioner
Docket No.
Taxable Year
Deficiency Emerson Television Sales Corporation
8493-71
10/31/66
$144,000.00
Emerson Radio Associates, Inc.
2088-71
1/31/67
$166,620.30
Transferee Liabilities (Transferor, Emerson Radio Associates, Inc.) Petitioner
Docket No.
Transferor's Taxable Year
Transferee Liability Jerome S. Lieb, et al.
2073-71
1/31/67
$15,000*
David N. Ravin, et al.
2074-71
1/31/67
$15,000*
Michael Kory
2075-71
1/31/67
$42,000*
Estate of Murray Golden
2076-71
1/31/67
$28,000*
*47 The issues presented for decision are: 1. Whether a $300,000 debt reduction allowed by Emerson Television Sales Corporation ("Television") to Emerson Radio Associates, Inc., ("Radio") is deductible by Television in its taxable year ended October 31, 1966 as (i) an ordinary and necessary business expense under section 162(a), [2] (ii) a loss under section 165(a) incurred in compromise and settlement of litigation, or (iii) an addition to Television's bad debt reserve under section 166(c), or whether the $300,000 credit was payment for Radio's goodwill. 2. Turning on the same determination, whether the $300,000 is ordinary income or proceeds from the sale of property (goodwill) to Radio for its taxable year ended January 31, 1967. 3. If the $300,000 was payment for Radio's goodwill, whether the corporation complied with the provisions of section 337 so as to avoid corporate-level recognition of the $300,000 gain realized. 4. Whether Radio is entitled to a bad debt deduction of $217,500, and, if so, in what year. *48 5. Whether petitioners Jerome S. Lieb, David N. Ravin, Michael Kory and Estate of Murray Golden are liable for Radio's unpaid corporate income tax liabilities as transferees of Radio's assets. Although Radio raised certain other issues in the pleadings, it offered no evidence thereon and made no mention of them on brief. We therefore deem them conceded. FINDINGS OF FACT Radio was a New Jersey corporation in dissolution with its principal office in care of Jerome S. Lieb ("Lieb"), in East Orange, New Jersey, when it filed its petition herein. It filed its Federal income tax return for its taxable years ended January 31, 1967 with the district director of internal revenue at Newark, New Jersey.
Television was a New York corporation with its principal office at Jersey City, New Jersey when it filed its petition.It filed its Federal income tax return for its taxable year ended October 31, 1966 with the district director at Newark.
Lieb was a partner in the law firm of Harkavy & Lieb. The partnership was dissolved and the partners, other than Harkavy, had become shareholders in the professional corporation of Lieb, Teich and Berlin, Inc. when the petition was filed. The *49 residences of all the former law partners and the principal place of business of the professional corporation were in New Jersey when the petition was filed. David N. Ravin ("Ravin") is a partner in the Newark law firm of Ravin and Ravin. At all times material to the issues in this case, the law partnerships of Harkavy & Lieb, and Ravin and Ravin, were shareholders in Radio. Michael Kory ("Kory") was Radio's president and majority shareholder. His legal residence when he filed his petition herein was New York, New York.
Murray Golden ("Golden"), a Newark resident, died intestate on December 2, 1969. Letters of administration were issued on February 24, 1970 to Annette Kesselman, whose legal address when the petition was filed was Long Island, New York. At all times material to the issues in this case, Golden was a major shareholder in Radio. Emerson Radio & Phonograph Corporation ("Emerson") was a New York corporation engaged in the manufacture of televisions, radios, phonographs, room air conditioners and home tape recording equipment. These products were manufactured under the national brand names "Emerson" and "DuMont." Television [3] was a wholly-owned subsidiary of Emerson. *50 In 1965 National Union Electric Corporation ("National Union") acquired a controlling stock interest in Emerson, in part by purchasing the stock owned by Benjamin Abrams ("Abrams"), now deceased, who was then Emerson's major shareholder, chairman of the board of directors and chief executive officer. When Abrams retired on February 16, 1966, National Union assumed operational control of Emerson. On May 31, 1966 Emerson was merged into, and became a division of, National Union, and Television became a wholly-owned subsidiary of National Union. In 1966 and for a number of prior years, Television was the vehicle through which the "Emerson" and "DuMont" brand name products manufactured by Emerson were distributed. Television conducted its national distribution business primarily through regional wholesale distributors, which in turn sold to retail dealers for ultimate sale to the public. Although Television owned some of its regional wholesale distributors, the majority were independent, franchised distributors. *51 The relationship between Television and its franchised distributors was that of a vendor-vendee.In 1966 Television had approximately 145 franchised distributorships located throughout the United States. In 1966, and for a number of years prior thereto, Radio was Television's franchised distributorship for the Newark-New York City metropolitan area. In 1966 Radio distributed "Emerson" products under a franchise agreement dated January 1, 1966, and "DuMont" products under a franchise agreement dated June 16, 1965. Both agreements with Radio were Television's standard form franchise agreements which it used with all its other franchised distributors. Each agreement was for a term of approximately one year, but was terminable at will by either party upon 30 days' written notice. Upon termination or expiration of the agreements, Radio was required to cease using the words "Emerson" and "DuMont." Under Abrams' management policies, Television sold its "Emerson" and "DuMont" products to Radio on open credit, generally not receiving payment from Radio until Radio received payment from its retail dealers. When Television became a wholly-owned subsidiary of National Union, Radio owed Television *52 $3,800,000 for sales made to it by Television. Although this indebtedness was secured, under a security agreement, by a lien on Radio's inventory, accounts receivable and certain other assets, National Union was concerned about this large indebtedness. National Union was also concerned about reported conflicts between Radio's two major shareholders, Kory and Golden, and about reported investigations of Radio by the Federal Trade Commission and the Internal Revenue Service. National Union's credit philosophy regarding franchised distributors was the opposite of Abrams' open credit policy. Therefore, in March 1966, National Union requested Kory either to provide additional capital for Radio or to give up the franchise for the metropolitan area distributorship. Kory not only refused both requests, but he also refused to permit an independent audit of Radio's financial condition. National Union thereupon decided to terminate Radio's distributorship agreements. On May 5, 1966, pursuant to the terms of the two agreements, Television sent Radio two letters, notifying Radio that effective June 4, 1966 it was terminating Radio's "DuMont" and "Emerson" distributorship agreements. On *53 May 17, 1966, Radio instituted a civil action in the Superior Court of New Jersey, Chancery Division, Essex County, against Emerson, Television, and Russell Feldmann, chairman and chief executive officer of National Union, seeking, among other things, to enjoin the defendants from terminating Radio's distributorship agreements. Radio moved in the action for a temporary injunction, which was denied by the Superior Court. "Leave to appeal" the denial of a temporary injunction was denied by the New Jersey Appellate Division. Subsequently, Radio sought "leave to appeal" the Superior Court's denial of the temporary injunction to the Supreme Court of New Jersey; however, before that appeal was decided by the Supreme Court of New Jersey, the parties entered into a settlement agreement, described below. As a result of the above-described litigation, on June 21, 1966, Abrams called Morton Rome, general counsel of Television, to discuss resolution of the conflict between Television and Radio. Although Abrams was neither a shareholder nor an employee of Radio, he had a significant relationship with Radio; he had been instrumental in founding Radio, he was Kory's father-in-law, and he personally *54 knew many of Radio's major customers. Rome and Abrams held several meetings. Rome wanted Radio to pay the large debt it owned to Television; Abrams wanted Kory to realize a sum of money in exchange for terminating the litigation. Rome was amenable to Abrams' request, provided Abrams personally guaranteed payment of Radio's debt to Television. As a result of the Abrams-Rome discussions, the parties orally agreed that Radio would assign to Television all its accounts receivable, and Television would credit Radio for inventory and other assets which Radio would transfer to Television. It was further agreed that Television would give Radio $300,000 credit on its indebtedness to Television in consideration for Abrams' personal guarantee for Radio's indebtedness, and Radio's dismissal of the litigation it had initiated against Television. Abrams and Rome never discussed goodwill. On June 23, 1966, Radio held a board of directors meeting. According to the minutes of that meeting, Kory reported that Television and Radio had orally agreed through Abrams and Rome (i) that Radio was to surrender its franchise distributorships and turn over to Television its "entire goodwill" represented *55 by all records and files relating to its sales and customers, and (ii) that Television was to allow Radio a $300,000 credit against Radio's indebtedness to Television. The remainder of the indebtedness was to be paid by Radio's transfer of all merchandise, fixed assets and accounts receivable, payment of which was to be guaranteed by Abrams. On motion, it was then resolved that the litigation between Television and Radio be settled on the basis of the above report, and Radio adopted a plan of complete liquidation and dissolution intended to qualify under section 337. The plan provided that the board of directors could abandon the plan if all Radio's assets were not sold within 12 months of the plan's adoption. The plan further provided that upon the sale of all its assets, Radio would cease doing business, make one or more substantial partial distributions of the sales proceeds to the shareholders, formally dissolve in accordance with New Jersey law, and distribute the balance of the sales proceeds and the remaining assets, if any, to its shareholders. Meanwhile, Rome and George C. Kern, counsel to National Union, met and drafted a document which eventually became the formal settlement *56 agreement between Emerson and Associates. None of Associates' attorneys participated in drafting the agreement. On June 29, 1966, Lieb, Morris Ravin, Abrams, Kory, Golden, Feldmann, Rome and Kern held a meeting. After some discussion concerning the settlement agreement, it was signed by Kory, Golden and Feldmann exactly as drafted a week earlier by Rome and Kern. The settlement agreement nowhere mentions goodwill. The stated purpose of the agreement was to provide for Radio's payment of its $2,963,622.46 indebtedness to Television and to end the litigation brought by Radio to enjoin Television's termination of Radio's franchises.
The agreement provides that Radio is to transfer and deliver to Television all its accounts receivable; inventory, rights and interests in leases; all fixtures, furniture and other fixed assets; all credit records, credit and debit records of dealer accounts, customer lists and other records relating to Radio's assets to be transferred under the agreement; and cash equal to the reserves on the books of Radio on the closing date in respect of a certain service contract. Television was to credit against Radio's debt the following: an amount equal *57 to the cash collected on the accounts receivable within 120 days from the closing date of the agreement; the aggregate value of Radio's inventory, less $25,000; the net depreciated book value of all fixtures, furniture and other fixed assets; $300,000; credits properly allowable to Radio in accordance with normal trade terms and practices theretofore in effect between the parties; and certain advertising commitments listed in a schedule attached to the agreement. Any indebtedness not paid within 120 days from the closing date by means of the above credits was to be paid by Radio within 20 days of its demand by Television. Radio and its shareholders agreed to cooperate with Television in its collection of Radio's accounts receivable. Radio agreed to dismiss with prejudice its lawsuit against Television within two days after the closing date. At the same time, Abrams, to induce Television and Radio to enter into the settlement agreement, guaranteed to pay any amount owed by Radio which Radio failed to pay within 20 days after demand by Television, as provided in the settlement agreement. The settlement agreement was entered into to settle the pending litigation and to guarantee *58 Television's collection of its discounted debt from Radio; it was not intended to be a sale of a business or of an intangible asset. Television began to collect the accounts receivable and to distribute "Emerson" and "DuMont" products in the metropolitan area through a new, wholly-owned subsidiary, Emerson New York-New Jersey, Inc., ("Emerson New York-New Jersey") which continued to use Radio's warehouse and telephone number. Emerson New York-New Jersey also used Radio's invoices which had already been prepared for a short period after the takeover. Television informed Radio's customers that Television had taken over Radio's metropolitan area distributorships by placing a stamp on the invoices instructing the obligor to pay to Television. As noted above, as a result of the settlement agreement the litigation pending between the parties regarding termination of the distributorship agreements was dismissed with prejudice by stipulation of the parties. On or about July 14, 1966, Radio filed with respondent a Form 966 information return which is required to be filed by corporations within 30 days after adoption of a plan of dissolution or complete or partial liquidation. On *59 August 4, Lieb wrote Kory requesting him to make the following general entry on Radio's books: Debit Accounts Payable - Emerson Radio, Inc.
$300,000.00
Credit Sale of Good Will, Customer Lists, etc.
$300,000.00
To reflect sale of good will, sales and credit organization, dealers' records, customers' lists, transfer of leasehold and equipment leases to Emerson Radio, Inc.
This entry was made on August 8, 1966. As of October 26, 1966, 120 days after the closing of the settlement agreement, Television claimed that Radio had failed to discharge its indebtedness to Television, and that the balance remaining after the $300,000 credit, was $279,440.54. Television also claimed that under the settlement agreement, Radio owed it $217,500 for indemnification of claims of retail dealers.On October 27, Television wrote Radio demanding payment of these sums within 20 days. On November 18, the sums not having been paid by Radio, Television wrote Abrams demanding performance by him on his personal guarantee. Radio claimed its indebtedness to Television was fully discharged and therefore neither Radio nor Abrams made the requested payments. After these demands, Radio *60 again filed suit in the New Jersey Superior Court, alleging that Television had not used its best efforts to collect the accounts receivable, and Television cross-complained for amounts it claimed were due under the settlement agreement. On March 25, 1968, Television, Emerson New York-New Jersey and National Union instituted a legal action in New York, alleging that Radio had collected accounts receivable due Television and Emerson New York-New Jersey in the amount of $254,563 from sales of "Emerson" and "DuMont" products generated by them since June 29, 1966, the effective date of the settlement agreement, and that Radio, instead of turning such amounts over to Television, used the amounts collected to purchase certificates of deposit. Sometime between February 1 and May 8, 1967, Radio had purchased the following certificates of deposit: Trade Bank & Trust Co. - Due 5/14/67
$250,000.00
Trade Bank & Trust Co. - Due 5/31/67
200,000.00
Marine Midland Grace Trust Co. - Due 6/2/67
187,000.00
$637,000.00
Abrams had de facto control of Radio's certificates of deposits, which he held not only to protect his and his son-in-law's interests, but, with shareholder *61 concurrence, also to pay claims against Radio and for liquidating distributions. With the exception of amounts due Television and potential Federal income tax liabilities, Radio's actual and potential remaining liabilities were minimal. On January 18, 1968, approximately 18 months after adoption of the plan of liquidation and one year prior to the final settlement with Television of the second New Jersey action, Abrams made a $90,000 pro rata liquidating distribution to Radio's former shareholders out of funds Abrams and the shareholders determined were not needed to meet claims, as follows: Michael Kory
$42,000
Murray Golden
28,000
Ravin and Ravin
10,000
Harkavy & Lieb
10,000
No distribution to the stockholders was made within 12 months after adoption of the plan of liquidation. No facts considered by Abrams and the shareholders when they approved the $90,000 liquidating distribution were unknown to them on June 23, 1967. The trustees in dissolution made no effort to evaluate claims or set aside assets to meet such claims prior to the close of the 12 month period. The $90,000 was available and could have been distributed within the 12 month period. *62 On January 10, 1969, the second New Jersey law suit initiated by Radio was settled, effective December 20, 1968. The settlement agreement embodied in the Judgment provided for payment to Television by Radio of $217,500, plus interest from October 11, 1968 at the same rate of interest as that paid on the certificates of deposit held by Radio. The $217,500 was in full discharge of Associates' indebtedness to Television as of October 26, 1966.The $217,500 consisted of the following items: Radio's liability to customers for accounts receivable credit balances
$ 79,852.00
Accounts receivable debit balances not collected by Television
116,092.00
Net of several disputed items not material to the issues in these cases
21,556.00
TOTAL
$217,500.00
The $79,852 consisted of previously accrued and deducted liabilities. The $116,092 was included in the net operating loss deduction of $202,925.38 allowed by respondent for Radio's taxable year ended January 31, 1967. Television, on the other hand, was not required to make any payments to Radio. Furthermore, Lieb and Ravin, as trustees, and Kory and Golden agreed to pay Radio's Federal tax liability and indemnify *63 Television against any transferee liability, and to indemnify Television and Emerson New York-New Jersey against all liabilities resulting from the court action brought in New York. Finally, Radio, Lieb, Ravin, Kory, Golden and Abrams' estate agreed to discharge Television from all claims they had against Television, except certain items specifically reserved in the Judgment, and Television agreed to reciprocate as to them. All litigations pending among the parties in New York and New Jersey were dismissed with prejudice. In addition, after institution of the New York suit by Television, but prior to settlement of the New Jersey case, Radio's trustees paid to Television $250,598.14 for monies Radio had collected for Television's account which were, in major part, remittances received by Radio for accounts receivable generated by Radio's sales of "Emerson" and "DuMont" products after execution of the June 28, 1966 settlement agreement. Radio's net sales and taxable income for its taxable years ended January 31, 1964 through 1967 were as follows: Year
Net Sales
Taxable Income 1964
$12,730,582
$14,889
1965
13,327,434
($8,620)
1966
12,285,468
24,578
*64 As of January 31, 1965 and 1966, Radio had a deficit book net worth of $101,759 and $101,413, respectively. Radio had no goodwill in the sense of any demonstrated earning power in excess of a reasonable return on its net assets. On its return for its taxable year ended October 31, 1966, Television deducted the $300,000 credit as an addition to its bad debt reserve. On its return for its taxable year ended January 31, 1967, Radio treated the $300,000 credit as long term capital gain from the sale of goodwill. Respondent, taking the position of a stakeholder, determined that both characterizations of the transaction were incorrect. OPINION Television contends that it is entitled to an ordinary deduction for the $300,000 reduction it allowed in its indebtedness from Radio as: (1) an ordinary and necessary business expense under section 162(a); (2) a loss under section 165(a); or (3) an addition to its bad debt reserve under section 166(c).Radio contends that the $300,000 credit Television gave it was for the purchase of its goodwill. Respondent's position is that of a stakeholder. It has made conflicting determinations against both parties and on brief takes no definitive *65 position. If we hold for Television, it may deduct the $300,000 credit in full and Radio must include the $300,000 in ordinary income. On the other hand, if we hold for Radio, it may treat the $300,000 as long-term capital gain and Television may deduct no part of it. After careful consideration of all the evidence, we conclude that Television is entitled to deduct the $300,000 credit in full as an ordinary and necessary business expense, and that the item is ordinary income to Radio. The settlement agreement purports to provide for the payment of Radio's debt of approximately $3,000,000, and to settle the litigation Radio instituted against Television upon Television's termination of Radio's franchises to distribute "Emerson" and "DuMont" products. Television gave Radio a $300,000 credit against its indebtedness and obtained, besides settlement of the pending litigation, Abrams' guarantee of Radio's debt to Television. As Lieb, attorney for Radio, admits, the settlement does not purport to be an agreement for the sale of a business and nowhere mentions goodwill. He testified that although the agreement did not state his understanding of the contract between the parties, *66 he recommended that his client (Radio) sign the agreement "as is" because of the duration of the meeting and the hour. We are not persuaded of the correctness of this testimony. Radio urges us to look beyond the agreement to other evidence to ascertain the "true" understanding of the parties.If we do so, we only confirm our view that the agreement, in fact, was what the writing calls it, and was not a contract for the purpose of a going business, including goodwill. [4]
*67 Kory's statements to Radio's board of directors at its meeting on June 23, 1966 that Television and Radio had orally agreed through Abrams and Rome that Radio surrender its franchises and turn over its entire "goodwill" represented by all its records and files relating to its sales and contracts, is flatly contradicted by Rome. We are offered no basis for Kory's report to the board. Kory did not testify at the trial. Both Lieb and Ravin, also an attorney for Radio, testified that the $300,000 credit was not only for the purchase of goodwill but also for settlement of the litigation. They also testified that Abrams did not insist on the credit in exchange for his guarantee of Radio's debt to Television. On the other hand, Rome, who actually negotiated the agreement with Abrams and drafted it with Kern's help, stated that Lieb had no involvement with the settlement agreement except on the day it was signed. In rebuttal to Lieb's testimony, Rome stated that there was never any discussion between him and Abrams concerning the sale of a going business; they were attempting to settle the lawsuit which was retarding Television's recovery of Radio's $3,000,000 debt. In Rome's view, *68 recovery of the debt was in doubt, and therefore Rome had demanded Abrams' guarantee. Kern, who drafted the agreement with Rome, testified that Television gave the $300,000 discount in order to get rid of the pending litigation and to put a floor under any loss to Television by getting Abrams' guarantee. Moreover, we are firmly convinced that Radio had no goodwill to sell.This Court has previously held that where, as here, a business sells brand name products pursuant to a nontransferable franchise which is terminable at will by the franchisor upon sufficient notice, the franchisee can possess no goodwill, for goodwill, if any, is inextricably connected to the franchise and ceases to exist when the franchise terminates. Frank E. Zorniger, 49 (6/27/74); ; . See also ; . Moreover, even were this not so, there is no demonstration that Radio had any excess earning power beyond a fair return on its net assets. We have found as a fact that Radio had *69 no goodwill. We have carefully considered all the evidence and the demeanor and credibility of the witnesses and have found as a fact that Television gave Radio a $300,000 credit on its indebtedness to settle the litigation concerning termination of Radio's franchises and to secure Abrams' guarantee of Associates' debt. The $300,000 credit is deductible by Television under section 162(a) [5] as an expense incurred to preserve, protect and promote an existing asset, namely, Television's accounts receivable payable by Radio; the credit did not result in the acquisition of a capital asset. See (C.A. 6, 1950), affirming ; ; ; . The $300,000 credit was also deductible by Television under section 162(a) as a compromise *70 payment to settle litigation. "The tax character of a payment in settlement of litigation must be ascertained by reference to the nature of the claim in respect of which the payment is made." . (C.A. 7, 1970). Here the claim arose out of Television's termination of Radio's franchises to distribute "Emerson" and "DuMont" products. The claim did not concern acquisition or protection of capital assets, but termination of a business relationship. See . Radio had nothing Television wanted or bargained for and Television, for all that appears, would have happily done without any of Radio's assets had Radio not precipitated the litigation and threatened the collectibility of its payables to Television. Therefore the payment to settle the claim is deductible by Television as a business expense. [6]
*71 The converse is that the credit results in $300,000 of ordinary income to Radio. Since the $300,000 credit is not attributable to the sale of goodwill, we need not consider whether Radio complied with the provisions of section 337 so as to avoid recognition of the alleged $300,000 gain. Section 337 by its terms shields from corporate-level recognition only gain or loss from the sale or exchange of property. Next, Radio claims it is entitled to deduct in its taxable year ended January 31, 1967, $217,500 paid Television some time after January 10, 1969, in settlement of its second New Jersey lawsuit. Radio is clearly in error.
The $217,500 consisted of: $21,556, the nature of which was not disclosed in the record and was stipulated to be "immaterial to this case"; $79,852 which was paid for previously accrued and deducted liabilities not involving a current deduction; and $116,092 to reimburse Television for uncollectible accounts receivable Television had acquired. No deduction can be allowed for the $21,556 in the absence of any evidence as to its nature. The $79,852, having been deducted once, may not be deducted again. Since the $217,500 was a contested claim until January 10, 1969, it *72 could not in any event be accrued as a deduction in the fiscal year ended January 31, 1967. Section 1.461-1(a) (2), . The $116,092 item was, in fact, deducted on Radio's return for its taxable year ended January 31, 1969, creating a net operating loss which was carried back to the year ended January 31, 1967. The only issue remaining is whether Lieb, Ravin, Kory and the Estate of Golden are liable as transferees under section 6901(a) for the income tax deficiency assessed against Radio, the transferor. A shareholder receiving corporate assets is liable as a transferee to the extent of the value of the corporate assets transferred to him, irrespective of the corporation's insolvency, except where local law provides a different rule. (C.A. 5, 1957). New Jersey follows the general rule. See ; . The shareholders *73 of Radio, all New Jersey residents, are liable as transferees to the extent of the liquidating distributions made, [7] which were as follows: Lieb, et al. $10,000
Ravin, et al. 10,000
Kory
42,000
Estate of Golden
28,000
TOTAL
$90,000
Decision will be entered for petitioner Emerson Television Sales Corporation in Docket No. 8493-71. Decision will be entered under Rule 155 in Docket Nos. 2073-71, 2074-71, 2075-71, 2076-71 and 2088-71. Footnotes
1. The following cases are consolidated herewith: David N. Ravin, Trading Together with Morris N. Ravin, Nathan Ravin and Others as Ravin & Ravin, Transferee, Docket No. 2074-71; Michael Kory, Transferee, Docket No. 2075-71; Estate of Murray Golden, Deceased, Annette Kesselman, Administratrix, Transferee, Docket No. 2076-71; Emerson Radio Associates, Inc., Corporation in Dissolution, Docket No. 2088-71; Emerson Television Sales Corporation, Docket No. 8493-71. ↩
*. Plus interest as provided by law. ↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
3. Previously Emerson Television Sales Corporation was named Emerson Radio, Inc. It changed its name to Emerson Television Sales Corporation on June 10, 1966. ↩
4. Emerson argues that (C.A. 3, 1967), requires us to sustain the agreement as written unless Radio proves mistake, undue influence, fraud, duress, etc. Appeal in this case lies to the Third Circuit. , affirmed (C.A. 10, 1971), certiorari denied . Respondent contends that the agreement is ambiguous on its face and therefore Danielson is inapplicable. However, even if the agreement were less than clear and Danielson inapplicable, the record would support Television's interpretation of this settlement agreement. Even in jurisdictions applying a rule less restrictive than Danielson, parties to a writing who have adverse tax interests will normally as against each other be left where the writing puts them, in the absence of "strong proof" that the writing incorrectly reflects the actual understanding. (C.A. 2, 1959), affirming . ↩
5. Section 162(a) provides "there shall be allowed as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." ↩
6. Having held that the $300,000 credit is deductible by Television as a business expense, we need not consider Television's alternate contentions that the $300,000 credit is deductible under sections 165(a) or 166(c). ↩
7. Plus interest as provided by laws ↩